IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MATTHEW KAPLAN, in his capacity as
Personal Representative of the Estate of
Zahavah Townsend,

No. 3:23-cv-00846-HZ

OPINION & ORDER

    Plaintiff,

  v.

STATE OF OREGON, by and through its
Department of Human Services, and
DANNE SLEZAK, in her individual
capacity,

    Defendants.


Joshua P. Lamborn
The Law Office of Josh Lamborn, P.C.
50 SW Pine St, Ste 301
Portland, OR 97204

   Attorney for Plaintiff


Craig M. Johnson
James S. Smith
Oregon Department of Justice

100 SW Market St
Portland, OR 97201

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiff, the personal representative of the Estate of Zahavah Townsend ("Z.T.")[1], brings suit against the State of Oregon and Danne' Slezak. Before the Court are Plaintiff's Motion for Judgment on the Pleadings or Summary Judgment on Defendants' First Affirmative Defense and Defendants' Motion for Partial Summary Judgment. For the following reasons, the Court grants Plaintiff's Motion in part and denies it in part and grants Defendants' Motion.

## BACKGROUND

      This case centers on the death of five-year-old Z.T. in an automobile collision on November 20, 2022, in which her mother was the driver. The relevant background traces several months earlier. On September 6, 2022, Z.T.'s father, Glenn Townsend, petitioned ex parte for an immediate danger order granting him temporary custody of Z.T., with no parenting time for her mother, Amber Gonzalez-Riddle. Smith Decl. ¶ 2, Ex. 1 at 2-3, ECF 33. The petition stated that Z.T. "went back to Portland with Amber and her ex boyfriend shot the house with the kids in the home. And she [Z.T.] came home with burns and bruises. Amber is being looked at by CPS [Child Protective Services] and she is looking to take [Z.T.] to Portland with active gang member who hit her and belittle her." *Id.* at 3. On September 7, 2022, Klamath County Circuit Judge Kelly Kritzer issued an immediate danger order with respect to Z.T. *Id.* at 4-5. The order granted Townsend temporary custody of Z.T. and no parenting time to Gonzalez-Riddle. *Id.*

---

[1] Plaintiff's Complaint lists the deceased child's full name in the case caption, and the parties have not addressed the privacy interests of a deceased child. The Court uses the child's initials throughout this Opinion consistent with standard practice in cases involving minors.

The Oregon Department of Human Services ("ODHS") wrote an assessment summary of the incident that formed the basis of Townsend's petition. Lamborn Decl. Ex. 4, ECF 46. The report assessed allegations that Geavony Ferreira, Gonzalez-Riddle's boyfriend, posed a threat of harm to Z.T. *Id.* at 3. It states that Ferreira was alleged to have shot at Gonzalez-Riddle's apartment in August 2022 while Z.T. was present. *Id.* at 5, 13. At the time of the assessment on September 5, 2022, there was no information gathered to indicate that Ferreira had perpetrated the shooting. *Id.* at 13. The assessment was closed with no child welfare intervention. *Id.*

The report also mentions that around the same time, Gonzalez-Riddle stated that she intended to go to rehab, and that she asked for help for her drug use (methamphetamine and cocaine). *Id.* at 5. The report lists prior investigations. In April 2022, a social worker found that allegations that Ferreira abused Z.T. were unfounded. *Id.* at 8. In January 2019, allegations that Gonzalez-Riddle neglected Z.T. were determined to be unfounded. *Id.* at 9. The report also shows that on September 6, 2022, social workers had unscheduled contact with Townsend and observed marijuana paraphernalia at his home. *Id.* at 10. Social workers reported that both Gonzalez-Riddle and Townsend struggled with sobriety. *Id.* at 14. When Z.T. was interviewed, she stated that she did not feel safe with her mother or with Ferreira because Ferreira shot guns. *Id.* at 14-15. She appeared to be happy and healthy in her father's care. *Id.* at 15.

The report states that on September 7, 2022, social workers interviewed Gonzalez-Riddle, who stated that Ferreira did not shoot at her apartment and that she had not had contact with him for several weeks. *Id.* at 15. Gonzalez-Riddle stated that she was not using substances, and that she had most recently used marijuana. *Id.* She did not appear under the influence of any substances during the interview. *Id.* Her home appeared to be an appropriate place for children. *Id.* at 16.

The assessment report lists the criminal history of Gonzalez-Riddle, Townsend, and Ferreira. *Id.* at 17. Gonzalez-Riddle's criminal history included assault in the fourth degree and harassment in 2014. *Id.* Townsend's criminal history included unlawfully purchasing a firearm, third degree theft, giving false information, unlawful possession of marijuana, "and many driving violations." *Id.* Ferreira's criminal history included attempt to commit a crime, unlawful use of a weapon, assault in the first and third degrees, unauthorized use of a motor vehicle, criminal mischief, and theft. *Id.* The most recent was from 2016. *Id.* The assessment concluded that the threat of harm to Z.T. from Ferreira was unfounded because he "ha[d] no criminal charges in the state of Oregon indicative of violence," he had not been arrested in connection with the shooting, Gonzalez-Riddle indicated that the shooters did not match his physical appearance, and Z.T. did not make any concerning disclosures about Ferreira. *Id.* at 19.

On October 10, 2022, Senior Circuit Court Judge Roxanne Osborne modified the immediate danger order by ordering that Gonzalez-Riddle "will exercise parenting time one three day weekend of each month, in Klamath County, Oregon only, all other conditions of the Immediate Danger Order will remain in effect." Smith Decl. Ex. 1 at 1. On Friday, November 18, 2022, Townsend dropped Z.T. off at Gonzalez-Riddle's father's home pursuant to the modified custody order. Lamborn Decl. Ex. 1 (Townsend Decl.) ¶ 4, ECF 45-1. He expected Gonzalez-Riddle to return Z.T. to him on November 20, 2022, through an intermediary. *Id.*

Chandra Awbrey was the "on call" supervisor for the Klamath Falls office of ODHS on the weekend including November 20, 2022. Awbrey Decl. ¶ 2, ECF 32. She supervised Defendant Slezak, a social worker, that weekend. *Id.* That day, Awbrey received an email from a screener at ODHS's statewide child welfare hotline notifying her of a call of concern about Z.T. *Id.* ¶ 3. The screening report stated that Z.T. had been injured and that the alleged perpetrator

was Townsend's significant other. Slezak Decl. ¶ 7, Ex. 2 at 3-5, ECF 31. The report stated that Z.T. alleged that Townsend's girlfriend had hit her while arguing with Townsend. *Id.* at 5. The case required an immediate response, and Defendant Slezak was assigned. Awbrey Decl. ¶ 3. Awbrey spoke with Defendant Slezak several times that day about the case. *Id.* ¶ 4. When the two realized that the case implicated the Indian Child Welfare Act ("ICWA"), they arranged to confer with a tribal representative, Linda Ruiz, and an ODHS employee named Marty Schroeder who works with the tribes. *Id.* The four had a conference call before Defendant Slezak met with Gonzalez-Riddle. *Id.*; Lamborn Decl. Ex. 3 (Slezak Dep.) 29:17-25. Slezak did not remember looking at the case before the conference call. Slezak Dep. 33:4-6.

Defendant Slezak spoke with Gonzalez-Riddle at 1:41 pm on November 20 to arrange a meeting. Slezak Dep. 78:25-79:3. Defendant Slezak had heard of both Gonzalez-Riddle and Townsend, but had never met either of them. *Id.* at 26:22-27:9, 28:5-7. She knew both of them previously had contact with CPS. *Id.* at 28:16-19. She had access to a screening report with a history of assessments for both of them. *Id.* at 34:15-25. Defendant Slezak looked up both Gonzalez-Riddle and Townsend. *Id.* at 35:11-16. She read the assessment of the shooting at Gonzalez-Riddle's apartment. *Id.* at 35:19-36:3. She did not recall reading any other assessments for Gonzalez-Riddle or any assessments for Townsend. *Id.* at 36:4-11. She did not look up either parent in the court system. *Id.* at 36:12-14. She could not recall whether anyone looked up their criminal histories for her. *Id.* at 36:15-17.

Defendant Slezak explained that before she met with Gonzalez-Riddle, she knew that Gonzalez-Riddle "was up in Portland at some point, and that she had a boyfriend or significant other that was of concern and the kids were living with her at the time and there was concerns about guns – a gun going off or a gun being shot." *Id.* at 40:12-17. She recalled that the

conclusion of the assessment was unfounded and did not recall any concerns in the assessment about Gonzalez-Riddle's ability to parent. *Id.* at 40:18-22. She did not know the extent of Gonzalez-Riddle's substance abuse issues. *Id.* at 41:1-3. She knew "that both parties [Gonzalez-Riddle and Townsend] had substance – or alleged substance issues." *Id.* at 41:7-10. Defendant Slezak stated that based on the screening report, "it sounded like mom came to Klamath for a visit, and dad – and the child was going to be returning to dad. That's what I knew." *Id.* at 42:11-14. She did not know about the immediate danger order before meeting the family. *Id.* at 42:15-19. She explained, "I only did my assessment on the physical abuse by the significant other to Glenn Townsend." *Id.* at 47:23-25. Defendant Slezak also knew that Geavony Ferreira, Gonzalez-Riddle's boyfriend, "was the subject – or a concern of the Portland assessment" involving the alleged shooting at Gonzalez-Riddle's apartment. *Id.* at 52:15-20. She did not know his criminal history. *Id.* at 53:18-21.

Defendant Slezak met with Gonzalez-Riddle in a Walmart parking lot in Klamath Falls at around 2:30 pm on November 20. Slezak Dep. 79:13-17. The purpose of the meeting was to talk to Gonzalez-Riddle and look for safety concerns, either present or potential. *Id.* at 79:11-12, 79:24-80:8. Defendant Slezak stated that the present safety concern was an injury to Z.T.'s forehead that was allegedly caused when Townsend and his significant other argued. *Id.* at 80:14-18. Once Gonzalez-Riddle arrived, Defendant Slezak and Gonzalez-Riddle got out of their cars and met at the back end of Gonzalez-Riddle's vehicle. *Id.* at 86:9-14. There was a male in the driver's seat of the car and a little girl who was not Z.T. who got out of the car with the male. *Id.* at 88:3-10. Defendant Slezak estimated that her conversation with Gonzalez-Riddle lasted at least 20 minutes. *Id.* at 89:1-2. She did not have a conversation with the male, who she later learned was Geavony Ferreira, or notice anything concerning about him. *Id.* at 89:10-18.

Gonzalez-Riddle told Defendant Slezak that when she picked Z.T. up on Friday, Z.T. had a bruise on her forehead. Slezak Decl. Ex. 2 at 21. When Gonzalez-Riddle asked Z.T. about the bruise, Z.T. told her that Townsend's girlfriend hit her. *Id.* Gonzalez-Riddle asked her again on Saturday and on Sunday morning, and each time Z.T. said the same thing. *Id.* She showed Defendant Slezak a video of Z.T. talking about the injury. *Id.* Gonzalez-Riddle told Defendant Slezak that she had her cousin, Ms. Tezanos, message Townsend about the bruise, and he said he did not have time to talk about it and to go ahead and turn it in (i.e., report it). *Id.* Tezanos showed the text messages to Defendant Slezak.

Defendant Slezak told Gonzalez-Riddle that she wanted to talk to Z.T. Slezak Dep. 89:22-23. Gonzalez-Riddle said that Z.T. was sleeping in the backseat and that she would wake her up. *Id.* at 89:23-25. Before Defendant Slezak went around the car, Z.T. jumped into the driver's seat to talk to her. *Id.* at 90:2-5. Defendant Slezak did not look into the car, but she did see one car seat for a toddler inside. *Id.* at 91:14-25. She knew there was a state law about when a booster seat must be used, but she did not know the specifics of it. *Id.* at 95:4-8. Defendant Slezak interviewed Z.T. for at least 10 minutes. *Id.* at 96:15-17. She was kneeling down to be at Z.T.'s eye level, and she noticed what appeared to be cigarette ash under the driver's seat. *Id.* at 96:11-13, 20-23. She also smelled "a whiff" of marijuana. *Id.* at 97:2-3. *See also* Slezak Decl. Ex. 2 at 20 (assessment report stating that Defendant Slezak noted "at one moment during the interview a slight hint of marijuana"). It did not cause her enough concern to observe areas of the car beyond the driver's seat. Slezak Dep. 100:3-6.

When interviewing Z.T., Defendant Slezak observed her to be "clean and properly dressed." Slezak Decl. Ex. 2 at 21. Z.T. stated that she liked her mother because she cooked noodles and liked her father because he bought her toys. *Id.* She said she didn't like it when

"Bre"—referring to her father's girlfriend—would hit her. *Id.* She said that her father and his girlfriend would get mad and "'bang' themselves into the walls and yell.'" *Id.* She said Bre hit her on the head. *Id.* Defendant Slezak asked Z.T. if she felt safe with her mother, and she said yes. *Id.* Defendant Slezak asked Z.T. if she felt safe at her mother's house and she said yes. *Id.* Defendant Slezak asked Z.T. if she felt safe with her father, and she no. *Id.* Defendant Slezak asked Z.T. if she felt safe at her father's house, and she said no, because Bre was mean to her. *Id.*

After Defendant Slezak finished interviewing Z.T., she told Gonzalez-Riddle that she would need to speak with her supervisor before a decision could be made. Slezak Dep. 100:12-15. She did not smell marijuana on Gonzalez-Riddle. *Id.* at 104:8-9. She did not smell marijuana on Ferreira or see signs that either of them was intoxicated. *Id.* at 112:8-13.

After Defendant Slezak met with Gonzalez-Riddle and Z.T., she reported to Awbrey that Z.T. had a visible injury to her face, had made credible disclosures of domestic violence at her father's home, and that she feared returning to her father but felt comfortable with her mother. Awbrey Decl. ¶ 5; Slezak Dep. 104:21-105:3. Defendant Slezak recommended a safety plan that placed Z.T. with her mother until she could be interviewed at CARES Northwest. Awbrey Decl. ¶ 5; Slezak Dep. 105:24-25. Defendant Slezak explained in her deposition that "a protective action for an ICWA family has to include a parent," and that she did not want to place Z.T. with Townsend because of the domestic violence concerns. Slezak Dep. 105:10-17. Because there were no founded assessments against Gonzalez-Riddle, Slezak determined it was better to place Z.T. with her. *Id.* at 105:18-21. When Defendant Slezak proposed the safety plan, she knew that Gonzalez-Riddle planned to drive from Klamath Falls to Portland. *Id.* at 116:4-6. Awbrey reviewed ODHS's system for records on Gonzalez-Riddle. Awbrey Decl. ¶ 6. She noted that there were several calls of concern but no "Founded" dispositions. *Id.* She did not review the

details of the calls or assessments. *Id.* Some time after 3:00 pm on November 20, 2022, Awbrey approved the safety plan Defendant Slezak proposed. *Id.*

After making the decision to place Z.T. with Gonzalez-Riddle, Defendant Slezak called Townsend. Townsend Decl. ¶ 5; Slezak Dep. 106:1-3. She told Townsend that there were allegations that he and his girlfriend had abused Z.T. and that she was opening an assessment. Townsend Decl. ¶ 5. Townsend denied the allegations and stated that Z.T. got the injury from dogs at the house. Slezak Decl. Ex. 2 at 21. Defendant Slezak told Townsend she was transferring custody of Z.T. to Gonzalez-Riddle and allowing her to take Z.T. to Portland. Townsend Decl. ¶ 5. Townsend told Defendant Slezak she could not do that because of the immediate danger order. *Id.* Defendant Slezak "told [Townsend] that they 'trump' the order." *Id.* Townsend became upset and told Defendant Slezak that Z.T. was in danger from Gonzalez-Riddle's boyfriend because he was a gang member who had shot at her apartment and that Gonzalez-Riddle had been using drugs and alcohol, and that she did not have a car seat for Z.T. *Id.* Defendant Slezak told Townsend she would hang up on him if he did not stop yelling at her. *Id.* Townsend "begged her not to let [Gonzalez-] Riddle take Z.T. and asked her to at least take her into protective custody of DHS during the assessment." *Id.* Defendant Slezak hung up on him. *Id.* Townsend immediately called 911 to report what had happened. *Id.* ¶ 6. The Oregon State Police told him that they would not intervene because ODHS had made the decision to place Z.T. with Gonzalez-Riddle. *Id.* After speaking with Townsend, Defendant Slezak left a message with the tribe. Slezak Dep. 111:18-20. She called CARES to try to schedule an appointment for Z.T. *Id.* at 111:20-22.

At approximately 6:09 pm on November 20, Gonzalez-Riddle's vehicle crashed while traveling on the highway in Lane County, Oregon, on the way to Portland. Lamborn Decl. Ex. 6

(Affidavit of Probable Cause). Gonzalez-Riddle's vehicle, "which was travelling westbound, crossed into the eastbound lanes and collided with" another vehicle. *Id.* Witnesses reported the vehicle was traveling between 75 and 80 miles per hour although the speed limit was 55, failed to stay in its lane, and passed in no-passing zones. *Id.* Witnesses reported seeing alcoholic beverage containers in the vehicle and smelling marijuana inside it. *Id.* Z.T. was secured with a lap belt but no additional child safety equipment. *Id.* She was small enough that Oregon law required a booster seat. *Id.* Z.T. died from the crash and from not being properly restrained. *Id.*

Gonzalez-Riddle was interviewed at the hospital. *Id.* She stated that she consumed two malt liquors and a shot of tequila before departing Bonanza, Oregon. *Id.* She also stated that she smoked marijuana with an unknown THC content both before leaving on the drive and during a stop on the drive. *Id.* Gonzalez-Riddle stated that "she gets stoned easily and didn't want to smoke too much because" she "get[s] stupid" when she is stoned. *Id.* The interviewing officer stated that she could smell alcohol on Gonzalez-Riddle's breath, and her eyes were red and glassy. *Id.*

Gonzalez-Riddle told the Oregon State Police that the road was starting to get icy. Smith Resp. Decl. ¶ 2, Ex. 1, ECF 36. She estimated she was traveling at about 40 miles per hour over the pass. *Id.* She stated that she tried to slow down and was slamming on the brakes, but they "were not working the best." *Id.* She also stated that Z.T. was not in a booster seat because she weighed 60 pounds and was too big for a booster. *Id.* She stated that she drank two beers at around 10 am that morning and was sharing them with her boyfriend. *Id.*

Ferreira told the Oregon State Police that Gonzalez-Riddle was driving the speed limit and then the vehicle started sliding. Smith Resp. Decl. ¶ 3, Ex. 2. He stated that the vehicle sped up once it started sliding, and Gonzalez-Riddle tried to correct the slide but could not. *Id.*

Ferreira admitted to drinking beer and smoking marijuana in the car, but stated that Gonzalez-Riddle was not drinking or smoking because she was driving. *Id.*

On March 9, 2023, Gonzalez-Riddle was indicted for manslaughter in the first degree, assault in the third degree, driving under the influence of intoxicants, and recklessly endangering another person. Lamborn Decl. Ex. 5. All charges arose out of the accident. *Id.*

Plaintiff sued Defendants on April 9, 2023, bringing claims for wrongful death, abuse of a vulnerable person under O.R.S. 124.105, and deprivation of rights under 42 U.S.C. § 1983. ECF 1-1. Defendants removed to federal court and answered the Complaint, alleging the affirmative defenses of comparative fault, qualified immunity, and the state-law damages cap. ECF 7. Plaintiff moved to remand to state court because the case was removed to the improper division, but Magistrate Judge Clarke instead transferred the case to the Portland Division. ECF 17. Plaintiff filed the Second Amended Complaint ("SAC") on January 11, 2024, asserting the same claims. ECF 25. Defendants answered, asserting the same affirmative defenses. ECF 26. After the close of discovery, the parties filed the present Motions.

## STANDARDS

### I.    Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "[T]he same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog," because the motions are "functionally identical." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). In reviewing a motion brought under Rule 12(c), the court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The court will grant a motion for judgment on the

pleadings if "there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id*. A Rule 12(c) motion may be based on either (1) the lack of a cognizable legal theory, or (2) insufficient facts to allege a cognizable claim. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his or her "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint must state a plausible claim for relief and contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## II.    Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

## I.    Plaintiff's Motion

Plaintiff moves for judgment on the pleadings as to Defendants' first affirmative defense of comparative fault, or in the alternative for summary judgment on that affirmative defense. Pl. Mot., ECF 29. He makes several arguments in support of his Motion: (1) Gonzalez-Riddle's fault cannot be considered because she does not fit within any of the categories in Oregon's comparative fault statute; (2) Gonzalez-Riddle's conduct was wanton or reckless and not merely negligent, which precludes comparison of her fault; (3) parental privilege applies; and (4)

comparing Gonzalez-Riddle's fault with Defendants' is improper because Plaintiff alleges that Defendants were responsible for preventing the harm inflicted by Gonzalez-Riddle. *Id.* at 3-8. Plaintiff also asserts that the affirmative defense cannot apply to his § 1983 claim. *Id.* at 8-9. Because the parties have cited evidence in the record in support of their positions on Plaintiff's Motion, and because the Court relied on that evidence in resolving the Motion, the Court treats the Motion as a motion for summary judgment. The Court concludes that genuine disputes of material fact remain, and Plaintiff is not entitled to summary judgment on the affirmative defense as asserted against the state-law claims.

> A.    Viability of Comparative Fault Defense

> > i.    Comparative Fault Statute

Under Oregon's comparative negligence scheme, a tort claimant may recover "if the fault attributable to the claimant was not greater than the combined fault of all persons specified in subsection (2) of this section, but any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the claimant." Or. Rev. Stat. ("O.R.S.") 31.600(1). Subsection (2) provides that the claimant's fault shall be compared "with the fault of any party against whom recovery is sought, the fault of third party defendants who are liable in tort to the claimant, and the fault of any person with whom the claimant has settled." O.R.S. 31.600(2).

Oregon's wrongful death statute provides:

> When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent, for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals, if any, who under the law of intestate succession of the state of the decedent's domicile would be entitled to inherit the personal property of the decedent, and for the benefit of any stepchild or stepparent whether that stepchild or stepparent would be entitled to inherit the personal property of the decedent or not, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission.

O.R.S. 30.020(1).

Plaintiff argues that Gonzalez-Riddle's fault cannot be compared with Defendants' fault on the wrongful death claim because she does not fit within any of the categories enumerated in the comparative fault statute. Pl. Mot. 3. Defendants argue that Gonzalez-Riddle, as a beneficiary of her child's estate in the wrongful death claim, is a "claimant," so her fault can be compared. Def. Resp. 2, ECF 35. Both parties cite *Robinson v. Children's Servs. Div.*, 140 Or. App. 429, 914 P.2d 1123 (1996). In *Robinson*, a mother sued the Children's Services Division ("CSD") and a private youth services corporation for the wrongful death of her son after her son committed suicide at a child treatment center run by the youth services corporation in which CSD had placed him. *Id.* at 431. The defendants asserted as an affirmative defense that the child contributed to his own death, and that the plaintiff and her spouse also contributed to the child's death "by physically and verbally abusing him and by failing to seek proper treatment for him, among other things." *Id.* The plaintiff argued that the defense was improper because she brought the claim in her capacity as the personal representative of her son's estate, not as a beneficiary of the estate. *Id.* After the trial court permitted the defense and the jury found that the mother and stepfather were primarily responsible for the child's death, the plaintiff appealed. *Id.* at 432.

Interpreting versions of the wrongful death and comparative negligence statutes that are materially similar to the current statutes, the Oregon Court of Appeals concluded that the negligence of beneficiaries to the wrongful death claim could be an affirmative defense to the claim. *Id.* at 438. The court also noted that the defense presented problems when the estate had multiple beneficiaries and only some were alleged to be at fault in the death. *Id.* at 437 n.4. The *Robinson* court did not need to decide the issue, but it stated:

> The prevalent view in other states is that contributory negligence is a defense that applies to claims for people who are designated beneficiaries even if the defense does not apply to all the beneficiaries in the action. *See, e.g., Restatement (Second) of Torts* § 493 & comment *a* (1965). Although not directly addressed in Oregon, we believe that Oregon law is consistent with the *Restatement* view on the issue, which would allow the defense in this case.

*Id.*

Plaintiff argues that this case is distinguishable from *Robinson* because here only Z.T.'s mother is alleged to be at fault; her father is not. Pl. Mot. 4. Plaintiff states, "Allowing the jury to consider Riddle's fault could destroy the father's claim if the jury is allowed to apportion fault between Riddle and defendants. The decision of whether to award any money to Riddle is best left up to the judge in any disbursement proceeding conducted by the probate court." *Id.* In his Reply, Plaintiff argues that "[t]he better practice when alleging fault of a beneficiary is to bring a third party claim against that beneficiary." Pl. Reply 2, ECF 48. Defendants counter that whether one or both of the beneficiaries is at fault "is a distinction without a difference." Def. Resp. 2. Defendants also point out that more recent cases in this district have applied *Robinson*. *Id.* (citing *Est. of Manstrom-Greening by & through Manstrom v. Lane Cnty.*, 393 F. Supp. 3d 1035 (D. Or. 2019)).

The Court first rejects Plaintiff's assertion that this issue should be left to the probate court. This lawsuit is about whether Defendants are liable to Plaintiff, not how the assets of Z.T.'s estate should be distributed. Plaintiff's argument that Defendants should have brought a third-party claim rather than raise an affirmative defense is unsupported by any citations to caselaw. Defendants could have proceeded that way, but *Robinson* shows that they did not have to. Nor does the Court believe that the existence of a beneficiary not alleged to be at fault is a basis to disallow the affirmative defense. Concerns on that point may have carried more weight in the era of contributory negligence, which often led to harsh results. Under current law, Z.T.'s

estate only has a right to recover from Defendants to the extent that Defendants are responsible for Z.T.'s death. That is a just result. If no comparison of fault were permitted, there is a risk that Defendants could be held financially responsible for more damages than corresponded to their share of fault. That result is inconsistent with the goals of Oregon's comparative negligence scheme. The Court rejects Plaintiff's first argument and concludes that Gonzalez-Riddle is a "claimant" under the comparative negligence statute for the wrongful death claim.

ii.    Reckless or Negligent Conduct

Plaintiff's second argument is that Gonzalez-Riddle's fault cannot be compared with Defendants' fault because her conduct was wanton or reckless, not negligent. Pl. Mot. 4-6. In a recent decision thoroughly reviewing the history of Oregon's comparative negligence statute, the Oregon Court of Appeals explained that "in a negligence action, a defendant who committed simple or gross negligence can use the defense of comparative fault against a negligent plaintiff—to reduce the plaintiff's award or even, if the plaintiff was sufficiently negligent, prevent any recovery—but a defendant who acted in a 'wanton' manner cannot." *Miller v. Agripac, Inc.*, 322 Or. App. 202, 214-15, 518 P.3d 957 (2022), *review denied*, 370 Or. 827, 526 P.3d 1193 (2023). This conclusion was based on the common-law rule that "if a defendant's conduct could be characterized as 'wanton,' then the plaintiff's contributory negligence was no defense." *Id.* at 215. The Oregon Court of Appeals has also held that a defendant alleged to be merely negligent cannot not seek to apportion fault with a defendant alleged to have engaged in wanton or intentional misconduct. *Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 379, 111 P.3d 762 (2005); *Miller*, 322 Or. App. at 224 ("The upshot of *Shin* is that the group of people identified in ORS 31.605—the group whose collective negligence is to be compared to the plaintiff's negligence for purposes of the defense of comparative fault—does not include

people who behaved wantonly or intentionally. Because those people are simply not in the comparison group, they not only cannot rely on the defense of comparative fault themselves, but no one can look to them for apportionment under ORS 31.605.") (citations and footnote omitted).

"'[W]anton' (or 'reckless') conduct is an aggravated form of negligence that differs from 'intentional' misconduct." *Miller*, 322 Or. App. at 221.[2] In the context of comparative negligence, "[r]ecklessness means an intentional doing or failing to do an act when one knows or has reason to know of facts which would lead a reasonable person to realize that their conduct not only creates unreasonable risk of harm to others but also involves a high degree of probability that substantial harm would result." *Id.* at 215 (quoting approved jury instruction). In contrast, intentional misconduct requires an intent to do the act *and* to cause personal injury. *Id.* at 217.

Plaintiff argues that Defendants' comparative fault allegations demonstrate reckless conduct. Pl. Mot. 5. That conduct includes driving under the influence of intoxicants at an unsafe speed and committing other driving violations. *Id.* Plaintiff also points out that Defendants admit in their Answer that Gonzalez-Riddle was indicted "on charges that include Manslaughter in the First Degree, two counts of Assault in the Third Degree, DUII and three counts of Recklessly Endangering Another Person." *Id.* (citing Lamborn Decl. ¶ 1). Plaintiff states that many of these offenses require a mental state of recklessness. *Id.* at 6.

Defendants respond that the police report about the car accident contains information supporting a finding that Gonzalez-Riddle was only negligent. Def. Resp. 3. Defendants state,

---

[2] In *Miller*, the Oregon Court of Appeals approved the trial court's jury instruction, which referred to "recklessness," stating that it did not matter whether the word "reckless" or "wanton" was used as long as the proper definition was used. 322 Or. App. at 220-21.

"Geovany Ferriera [sic] described the driving as far from reckless, and said the vehicle was proceeding at the speed limit before sliding. Amber Gonzalez-Riddle described Highway 58 through the Willamette Pass as icy. From such testimony, the jury could certainly conclude Gonzalez-Riddle's conduct was only negligent." *Id.*; Smith Resp. Decl. ¶¶ 2-3, Exs. 1-2. Defendants acknowledge that Gonzalez-Riddle and Ferreira may have credibility issues, but state that credibility is for the jury to decide. Def. Resp. 3. Defendants also point out that "Gonzalez-Riddle has been convicted of nothing." *Id.*

The Court agrees with Defendants that there is a genuine dispute of material fact as to whether Gonzalez-Riddle's driving was reckless or negligent. The Oregon Supreme Court has recognized that the distinction between gross negligence and reckless or wanton conduct is often difficult to make. *Miller*, 322 Or. App. at 218 (citing *Falls v. Mortensen*, 207 Or. 130, 144, 295 P.2d 182 (1956)). In this case the jury must make the distinction. As for Gonzalez-Riddle's pending charges, not only has she not been convicted, but the Oregon Court of Appeals has indicated that the definition of recklessness in the context of comparative negligence is not identical to the definition of recklessness in Oregon criminal statutes. *Id.* at 221.

       iii.    Parental Privilege

Plaintiff's third argument is that parental privilege bars the claim. Pl. Mot. 6-7. Plaintiff states, "in order for defendants to compare the fault of Riddle, she must be liable in tort to Z.T., but in order for her to be liable in tort to Z.T., her conduct must be 'palpably unreasonable,' which is synonymous with reckless or wanton. If her conduct is reckless or wanton, defendants cannot compare her fault under Oregon's comparative fault statute." *Id.* at 7. Defendants correctly state that Plaintiff's argument misapplies Oregon law on parental liability for harm to children. Def. Resp. 3-4 (citing *Winn v. Gilroy*, 296 Or. 718, 681 P.2d 776 (1984)).

In *Winn*, "the Oregon Supreme Court abandoned the common law concept of parental immunity, and adopted the Restatement (2d) of Torts Section 895G as the new standard for evaluating cases involving tort claims by children against parents." *Id.* Under this standard, a parent is not immune from tort liability solely based on the parent-child relationship, but certain conduct is privileged or not tortious. *Winn*, 296 Or. at 727 (citing Restatement (Second) of Torts, § 895G (1979)). The *Winn* court stated, "It is possible to distinguish between those obligations that a parent owes his or her child specifically by virtue of parenthood from the general duty of ordinary care to avoid foreseeable harm that the defendant would owe to other persons, for instance to someone else's child, under the same circumstances." *Id.* at 732. *Winn* involved a father who drank alcohol and drove his car at an excessive speed with his minor children as passengers, lost control of the vehicle, and crashed head-on into another vehicle, killing the children. *Id.* at 720. The Oregon Supreme Court found that the father's negligent driving did subject him to liability toward his children because his duty of care to his children was the same as it would be to anyone else riding in the vehicle. *Id.* at 733.

In contrast, "if the conduct grows directly out of the family relationship, it may be considered tortious only if it is 'palpably unreasonable.'" *Martin v. Yunker*, 121 Or. App. 77, 82, 853 P.2d 1332 (1993) (quoting Restatement (Second) of Torts § 895G, cmt. k at 431). Conduct is palpably unreasonable if it constitutes "'gross negligence,' which is defined as reckless disregard of the rights of others." *Id.* at 83.

To determine whether conduct is tortious, courts conduct a two-step inquiry:

First, it must be determined whether the conduct entails strictly parental obligations. If not, the conduct may be evaluated without regard to the relationship of the parties. If so, a second determination is required: whether that strictly parental conduct is merely unreasonable, in which case it is "not tortious," or whether it is "palpably unreasonable," in which case the conduct may give rise to parental liability.

*Id.* at 82.

In this case there is no need to advance beyond the first step. As Defendants point out, *Winn* remains good law and has similar facts to this case. Def. Resp. 3-5. Gonzalez-Riddle's conduct in using marijuana and alcohol and driving poorly did not encompass strictly parental obligations, so her relationship to Z.T. does not bar a claim against her or comparison of her fault. In his Reply, Plaintiff agrees that this conduct is not privileged or non-tortious. Pl. Reply 3. Plaintiff states that he may raise the issue again "[i]f defendants expand their argument to include Riddle's conduct related to gaining custody of Z.T." *Id.* Thus, the parties agree that the parent-child relationship does not bar Defendants' comparative fault defense as it is pleaded.

        iv.    Propriety of Comparative Fault Defense

Plaintiff's final argument is that "the defense of comparative fault is also not available to defendants in this case because they are trying to compare the fault of a person their own fault enabled, which is the very basis of the plaintiff's claim." Pl. Mot. 7. Plaintiff argues that because his claim is that Defendants failed to uphold their duty to prevent Gonzalez-Riddle's behavior, "[t]he defense cannot then try to compare their fault with the actor they were supposed to keep from harming the decedent." *Id.* Plaintiff notes that this argument was not raised in *Robinson*. *Id.* at 7-8.

Plaintiff relies on *Cole v. Multnomah Cnty.*, 39 Or. App. 211, 592 P.2d 221 (1979). In *Cole*, the plaintiff was injured while incarcerated when he set his bedding on fire in what he alleged was a suicide attempt. *Id.* at 213. The record included evidence that for a month before the incident, the plaintiff's behavior became odd, and he asked a guard for materials to kill himself. *Id.* The plaintiff alleged that the defendants should have known that he was mentally ill and potentially suicidal and failed to protect him from himself. *Id.* The defendants raised the

defense of the plaintiff's negligence. *Id.* at 214. The Oregon Court of Appeals held that the defense should not have been submitted to the jury, stating, "Defendants' allegations of contributory negligence simply restate what plaintiff alleged in his complaint[:] that he was driven by mental illness to attempt suicide. Under these circumstances, the acts which plaintiff's mental illness allegedly caused him to commit were the very acts which defendants had a duty to prevent, and these same acts cannot, as a matter of law, constitute contributory negligence." *Id.* (citing *Vistica v. Presbyterian Hospital*, 67 Cal. 2d 465, 62 Cal. Rptr. 577, 432 P.2d 193 (1967); *Hunt v. King County*, 4 Wash. App. 14, 481 P.2d 593 (1971)). The court explained, "If plaintiff was not mentally ill, or if corrections officials were reasonably unaware of any illness, then defendants prevail because they were not negligent, not because plaintiff was contributorily negligent." *Id.*

Defendants argue that *Cole* does not apply because "[i]n this case, plaintiff's contentions center around ODHS's failure to give proper credence to a state court custody order and failure to fully investigate reports the boyfriend was involved in gang activity and violence. Since the gravamen of plaintiff's case has nothing to do with the mother's driving record or safety, plaintiff's argument makes little sense." Def. Resp. 5. Plaintiff counters that the SAC alleges that, among other things, Defendants failed to investigate whether Gonzalez-Riddle was intoxicated before she started driving and failed to investigate whether she had adequate child safety restraints in the car. Pl. Reply 3; SAC ¶ 12 (alleging that Defendant Slezak smelled marijuana in the car and that Z.T. was asleep in the backseat without a booster seat when Defendant Slezak interviewed Gonzalez-Riddle).

Reviewing *Cole* more recently, the Oregon Court of Appeals explained:

Although we elaborated little in *Cole*, the cases upon which we relied, *Hunt* and *Vistica*, show that our reasoning was based on a common-law understanding of duty

> that, in a jail or similar setting, custodians assume the duty of self-care for individuals under their exclusive control. An inmate cannot be liable for breaching a duty of which he was absolved. This understanding is prevalent.

*Gardner v. Oregon Health Scis. Univ.*, 299 Or. App. 280, 287, 450 P.3d 558 (2019) (footnotes omitted) (holding that decedent's conduct in committing suicide could properly be compared with conduct of outpatient hospital). *See also Appleyard v. Port of Portland*, 311 Or. App. 498, 515, 492 P.3d 71 (2021) (interpreting *Cole* the same way).

The question is whether the reasoning of *Cole*, as clarified by *Gardner*, applies in this case. The Court concludes that it does not. The Oregon Court of Appeals has repeatedly interpreted the case to be limited to custodial circumstances in which a care provider assumed a duty of self-care for a patient or inmate. Z.T. was not in the custody of ODHS, and Gonzalez-Riddle was not absolved of her own duty toward Z.T. Therefore, her fault may properly be compared with Defendants'. In sum, Defendants' comparative fault affirmative defense is viable as to the wrongful death claim.

**B.    Application of Comparative Fault Defense to § 1983 Claim**

Finally, Plaintiff argues that the affirmative defense of comparative fault cannot apply to the § 1983 claim. Pl. Mot. 8-9. Noting that no Ninth Circuit cases have addressed the issue, Plaintiff points to decisions by courts of appeals in other circuits and district courts in this circuit concluding that comparative fault does not apply to § 1983 claims. *Id.* (citing *Quesada v. County of Bernalillo*, 944 F.2d 710 (10th Cir. 1991); *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 736 (6th Cir. 2002); *Hurley v. Horizon Project, Inc.*, 2009 WL 5511205, at *5 (D. Or. Dec. 3, 2009); *Estate of Moreno v. Correctional Healthcare Companies, Inc.*, 2019 WL 10733237, at *2 (E.D. Wash. Aug 5, 2019)). Defendants do not respond to Plaintiff's argument. The Court concludes that the defense of comparative fault does not apply to Plaintiff's § 1983 claim. The

level of culpability required in a § 1983 claim like the one raised here is, as discussed below, high enough that comparison of fault would not be permitted under Oregon law. The Court therefore need not address the other considerations raised in some of the cases Plaintiff cites. Plaintiff's Motion is granted as to the § 1983 claim and denied as to the state law claims.[3] However, because Defendants are entitled to summary judgment on the § 1983 claim, the issue is moot. The Court now turns to Defendants' Motion.

## II.   Defendants' Motion

Defendants move for summary judgment on Plaintiff's second claim for relief, under 42 U.S.C. § 1983, which alleges that Defendant Slezak's actions in placing Z.T. with Gonzalez-Riddle constituted a state-created danger and violated Z.T.'s due process rights. Def. Mot. 1, ECF 30; SAC ¶ 34. The Court grants Defendants' Motion.

### A.   Legal Standard

Generally, the Fourteenth Amendment does not impose a duty on the state to protect individuals from third parties. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). "This rule is modified by two exceptions: (1) the 'special relationship' exception; and (2) the 'danger creation' exception." *Morgan v. Gonzales*, 495 F.3d 1084, 1092 (9th Cir. 2007) (internal quotations omitted). "The danger creation exception arises when affirmative conduct on the part of the state places a party in danger he [or she] otherwise would not have been in." *Id.* (internal quotations omitted). "The affirmative act must create an actual, particularized danger."

---

[3] Neither party discusses Plaintiff's claim under Oregon's vulnerable person statute. The Court therefore concludes that Plaintiff either did not move on that claim or intended to rely on the same arguments as for the wrongful death claim. The outcome is the same either way.

*Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018). "[T]he ultimate injury to the plaintiffs must be foreseeable." *Id.* The state actor "must have also acted with deliberate indifference to a known or obvious danger." *Id.* (internal quotations omitted).

B.    Application

i.    Affirmative Act

Rather than looking to the options available to the defendant at the time the relevant affirmative act was taken, courts must ask "whether the officers left the person in a situation that was more dangerous than the one in which they found him [or her]." *Hernandez*, 897 F.3d at 1133. Defendants argue that Defendant Slezak's decision left Z.T. in the same position she was in before the decision was made: in the unsupervised care of her mother. Def. Mot. 6. Defendants point out that although an immediate danger order had been issued, it was modified to allow Gonzalez-Riddle a three-day weekend of unsupervised parenting time each month. *Id.* at 7. Defendants assert that the risk to Z.T. from Gonzalez-Riddle's drinking and driving was present during that whole weekend, before Defendant Slezak made any placement decision. Def. Reply 2, ECF 49. They also argue that the risk of a car accident was not particularized to Z.T. Def. Mot. 7. Defendants rely on *Martinez v City of Clovis*, 943 F.3d 1260 (9th Cir. 2019).

Plaintiff counters that Defendant Slezak's safety plan was an affirmative act that removed Z.T. from her father's custody and placed her with Gonzalez-Riddle. Pl. Resp. 6, ECF 45. Plaintiff argues that without Defendant Slezak's decision, Z.T. would have been returned to Townsend's custody and would not have been driven to Portland by Gonzalez-Riddle. *Id.* at 8. Plaintiff also points out that the Oregon State Police did not act in response to Townsend's call because of Defendants' placement decision. *Id.* at 9. Plaintiff analogizes this case to *Murguia v. Langdon*, 61 F.4th 1096 (9th Cir. 2023).

25 – OPINION & ORDER

In *Martinez*, the plaintiff sued her husband—a police officer—and other members of the police department under § 1983 based on spousal abuse. 943 F.3d at 1265. The plaintiff called 911 after an episode of abuse, and two officers responded. *Id.* at 1266. Her husband was present, and one of the officers was a friend of his; she was only willing to speak to the other officer. *Id.* That officer believed that the plaintiff was a victim of domestic violence but did not arrest the husband or provide victim assistance information to the plaintiff. *Id.* at 1267. That night, the plaintiff's husband physically abused her. *Id.* Approximately a month later, the plaintiff's husband abused her again and 911 was called; the responding officers noted signs of abuse and one of them intended to arrest the husband, but the supervising officer ordered that no arrest be made. *Id.* at 1268. The officers again did not give any victim assistance information to the plaintiff. *Id.* at 1268-69. The next day, the plaintiff's husband beat and sexually assaulted her again, and he was arrested. *Id.* at 1269. The Ninth Circuit concluded that failure to inform the plaintiff of her rights and options and failure to arrest her husband were not affirmative acts because they "simply left Martinez in the same position she was in before the police had arrived." *Id.* at 1272. However, when one officer disclosed the plaintiff's complaints to the husband and asked him if the plaintiff was "the right girl" for him, that could have emboldened him to commit further abuse. *Id.*

In *Murguia*, the plaintiff's partner (one of the defendants) had a mental health crisis, and the plaintiff called 911. 61 F.4th at 1099-100. Three groups of law enforcement officers interacted with the defendant over the course of the day. The first group separated the plaintiff and defendant, left the couple's 10-month-old twins with the defendant, and allowed the defendant and a neighbor to take the twins to church and did not allow the plaintiff to follow. *Id.* at 1100. Second, a police officer drove the defendant and the twins from the church to a

women's shelter. *Id.* Third, different police officers brought the defendant and the twins from the women's shelter to a motel, where the defendant drowned the twins during her ongoing mental health crisis. *Id.* The Ninth Circuit held that the district court had improperly limited the analysis to whether the defendant had custody of the twins. *Id.* at 1112. The Ninth Circuit found that the plaintiff's claim failed as to the first group of officers because nothing indicated that the twins were less safe when left with the neighbor, who had experience supervising people with mental health disorders. *Id.* at 1112-13. The plaintiff stated a claim against the officer who arranged for the motel because the officer knew that the defendant was undergoing a mental health crisis, that her behavior was erratic, and that the twins were highly vulnerable. *Id.* at 1113-14.

The Court concludes that Plaintiff has adequately alleged an affirmative act that placed Z.T. in a danger she would not otherwise have faced. Defendant Slezak's affirmative act of proposing continued temporary placement with Gonzalez-Riddle, which her supervisor adopted, permitted Gonzalez-Riddle to drive to Portland with Z.T. If Defendant Slezak had not proposed the safety plan, Z.T. would not have remained in her mother's care and would not have been driven to Portland. Defendant Slezak's actions changed the course of events that would have occurred had she not made the placement recommendation she did. Thus, her actions are more like those of the officer in *Murguia* who arranged for the mother and children to be taken to a motel than those of the officers in *Martinez* who failed to arrest the perpetrator of domestic violence. Although Defendant Slezak may have had good reason to believe that placing Z.T. with Townsend presented a danger to her from domestic violence, extending the length of Z.T.'s time with Gonzalez-Riddle exposed Z.T. to an extended period of risk from Gonzalez-Riddle's conduct that she would not otherwise have faced.

Defendants also argue that the danger Z.T. faced was not particularized to her. Def. Mot. 7. They state, "The risk faced by plaintiff's decedent is that the driver of the car she was in (be it her aunt, her mother, her father, her father's girlfriend, Geovany Ferreira or an Uber driver) would drive safely. It is the same risk every child or non-driver takes every day they are involved in automobile travel." *Id.* The Court rejects this argument. The danger Z.T. faced was particularized to her because she was a passenger in her mother's car while in her mother's custody, and in the light most favorable to Plaintiff, the car accident happened due to Gonzalez-Riddle's poor driving and her decision not to get a booster seat for Z.T. Had the accident happened based on another driver's conduct, or a landslide on the road, the risk would not be particularized to Z.T. But a reasonable jury could conclude that Z.T. was harmed because she was placed in her mother's custody. The first element of the test is met.

ii.    Foreseeability

For the injury to be foreseeable, the plaintiff need not show that the exact injury suffered was foreseeable. *Martinez*, 943 F.3d at 1273. "Rather, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances." *Id.* at 1273-74. Defendants argue that the car accident was not foreseeable because the immediate danger order centered on the risk of gang ties and gun violence, not driving under the influence. Def. Mot. 7-8. They argue there is no evidence that Defendant Slezak knew that Gonzalez-Riddle would drive, would be intoxicated while doing so, or would drive poorly, and thus the injury was not foreseeable. *Id.* at 8. Plaintiff responds that Defendant Slezak knew about the immediate danger order and that it concerned Gonzalez-Riddle, that she knew Gonzalez-Riddle had a history of substance abuse, and that she smelled marijuana in the car. Pl. Resp. 10. Plaintiff also notes that Townsend warned Defendant Slezak that Gonzalez-Riddle did not have a car seat. *Id.*

The Court agrees with Defendants that the immediate danger order does not establish foreseeability because it was issued based on allegations of a gang-related shooting, which has nothing to do with the manner in which Z.T. ultimately died. The other evidence Plaintiff cites does not create a genuine dispute on foreseeability. Gonzalez-Riddle's history of substance abuse does not show that it was foreseeable that she would drink alcohol or use drugs and drive. Plaintiff has not pointed to a recent history of driving while intoxicated or evidence that Gonzalez-Riddle was intoxicated when Defendant Slezak met with her. Defendant Slezak testified in her deposition that she spoke with Gonzalez-Riddle for about 20 minutes, standing at the back of her car, and did not detect signs of intoxication. Gonzalez-Riddle was not driving when she arrived at the meeting, and there is no evidence that Defendant Slezak knew or should have known that she would be the one driving to Portland. The brief whiff of marijuana in the car is insufficient to show that it was foreseeable that Gonzalez-Riddle would drive while intoxicated and get in a car accident.

Plaintiff compares this case to *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) and *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In *Kennedy*, the plaintiff told the police that a 13-year-old neighbor boy had molested her child, and that the boy "had been involved in fights at school, had lit a cat on fire, had broken into his girlfriend's house and attacked her with a baseball bat, and had thrown rocks at a building in downtown Ridgefield." 439 F.3d at 1057-58. The officer told the plaintiff that he would notify her before contacting the boy's family about the molestation allegations. *Id.* at 1058. The investigation proceeded, and the officer ultimately told the boy's family about the allegations without first notifying the plaintiff. *Id.* When the plaintiff found out, she expressed fear, and the officer said police would patrol the area that night. *Id.* The following morning, the boy broke into the plaintiff's house and shot her

and her husband. *Id.* The Ninth Circuit did not analyze foreseeability as a separate element, but in assessing deliberate indifference, it noted that the officer had been informed at the outset of the boy's violent tendencies, including breaking into his girlfriend's house and assaulting her with a baseball bat. *Id.* at 1064. The Ninth Circuit also stated that "the exact injury by a third party" need not be foreseeable. *Id.* at n. 5 (citing *Wood*, 879 F.2d at 590 (foreseeability element did not require proving that state trooper knew the plaintiff would be raped by a motorist who gave her a ride after the officer left her alone in a known high-crime area at 2:30 am with no means of transportation)).

In both *Kennedy* and *Wood*, the injury suffered was of the type that could reasonably be expected to occur under the circumstances. In *Kennedy*, it was foreseeable based on the boy's prior conduct that he would perpetrate a violent attack on the plaintiff, even if the exact form of the attack might not be known. And in *Wood*, a rape was within the class of injuries that would be foreseeable under the circumstances (as would be a robbery or a simple assault, for example). Here, in contrast, Gonzalez-Riddle's intoxicated driving was not foreseeable based on the immediate danger order. The other evidence Plaintiff points to is insufficient to create a genuine dispute of material fact on foreseeability. Because Plaintiff has not shown foreseeability, Defendant Slezak is entitled to summary judgment on the § 1983 claim. The Court will still address the deliberate indifference element, which also supports granting Defendants' Motion.

iii.    Deliberate Indifference

"Deliberate indifference is a stringent standard of fault, requiring proof that a [state] actor disregarded a known or obvious consequence of his [or her] action." *Murguia*, 61 F.4th at 1111 (internal quotations omitted). "For a defendant to act with deliberate indifference, he [or she] must recognize the unreasonable risk and actually intend to expose the plaintiff to such risks

without regard to the consequences to the plaintiff." *Id.* (cleaned up). "In other words, the state

actor must know that something *is* going to happen but ignore the risk and expose the plaintiff to

it." *Id.* (cleaned up). The Ninth Circuit has held that this standard is purely subjective for non-

detainee failure-to-protect claims. *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156,

1160-61 (9th Cir. 2021); *Polanco v. Diaz*, 76 F.4th 918, 928 n.7 (9th Cir. 2023), *cert. denied*, No.

23-722, 2024 WL 2116277 (U.S. May 13, 2024), and *cert. denied*, No. 23-842, 2024 WL

2116278 (U.S. May 13, 2024).

Defendants argue that nothing in the record shows that Defendant Slezak knew that

Gonzalez-Riddle would drive poorly and chose to expose Z.T. to that risk anyway. Def. Mot. 8.

They point out that Defendant Slezak noted nothing odd in Gonzalez-Riddle's behavior and no

evidence that she was intoxicated. *Id.* And they argue that although ODHS records on Gonzalez-

Riddle show a history of substance abuse, Defendant Slezak did not review the full file. *Id.* at 9.

They also emphasize that the immediate danger order was based on complaints about Ferreira's

gang connections and use of firearms, and that the order was amended to allow Gonzalez-Riddle

a three-day weekend in which she could take Z.T. anywhere in Klamath. *Id.* They state, "implicit

in the Order is that Gonzalez-Riddle will be driving with the child." *Id.*

Plaintiff responds that "the Immediate Danger Order speaks for itself." Pl. Resp. 11.

Plaintiff states, "Slezak also ignored everything Townsend told her on the phone about Riddle's

drug use, gang affiliation and that she had no car seat for Z.T.," as well as the smell of marijuana

coming from the vehicle. *Id.* He states, "She never asked Riddle any questions concerning Z.T.'s

safety, and she never talked to Ferreira or even found out who he was until after they left." *Id.*

Pointing out that Defendant Slezak did not question Gonzalez-Riddle or Ferreira about marijuana

use, Plaintiff argues, "deliberate ignorance amounts to deliberate indifference." *Id.* at 12.

Plaintiff also argues that this was not an emergency situation because Defendant Slezak had time to consult her supervisor and could have changed her decision even after Gonzalez-Riddle and Ferreira left the Walmart. *Id.* at 12-13. Plaintiff questions why Defendant Slezak did not look into the immediate danger order more or discuss it with her supervisor. *Id.* at 13.

Defendant Slezak mistakenly believed that her own findings of a risk to Z.T. based on domestic violence at Townsend's home "trumped" the immediate danger order. Slezak Dep. 135:22-136:15. The Ninth Circuit has indicated that mistaken beliefs do not support a finding of deliberate indifference. *See, e.g.*, *Herrera*, 18 F. 4th at 1162 (defendant's mistaken belief that disabled student was in the locker room, not the pool, did not show deliberate indifference to risk of drowning). Because the standard for deliberate indifference is fully subjective in this case, Defendant Slezak's mistaken belief does not support finding that she was deliberately indifferent to a risk to Z.T. based on her misunderstanding of how to apply the immediate danger order to the situation. Further, as Defendants point out, the immediate danger order did not alert Defendant Slezak to a risk based on Gonzalez-Riddle's substance use or driving. Def. Reply 4. The harm that befell Z.T. was not within the class of harms to which the order could reasonably be said to alert Defendant Slezak. And the order had been modified to allow Gonzalez-Riddle one unsupervised weekend with Z.T. per month with no listed restrictions on driving. For all of these reasons, a reasonable jury could not conclude that Defendant Slezak was deliberately indifferent based on the immediate danger order.

The record does not otherwise support a finding of deliberate indifference. Defendant Slezak interviewed Gonzalez-Riddle and found no signs of intoxication or inappropriate behavior, observed that Z.T. appeared to be dressed appropriately, and interviewed Z.T., who stated that she was afraid to go to her father's house but felt safe with her mother. Defendant

Slezak had credible evidence of harm to Z.T. at Townsend's home. Gonzalez-Riddle showed her a video of Z.T. stating what had happened and her cousin's text communications with Townsend about Z.T.'s injury. That the finding of abuse by Townsend's significant other was ultimately overturned on appeal in April 2023, *see* Lamborn Decl. Ex. 2, does not change the analysis as to the time Defendant Slezak made her decision. There is no evidence that Defendant Slezak subjectively perceived a risk to Z.T.

Plaintiff's arguments center on Defendant Slezak's failure to investigate further based on information in the ODHS reports and Townsend's statements. Plaintiff states, "Slezak didn't know exactly what harm would befall Z.T. in her mother's custody, but Slezak knew she wasn't safe." Pl. Resp. 12. The record does not support finding that Defendant Slezak knew that Z.T. would not be safe with Gonzalez-Riddle. A jury could reasonably find that Defendant Slezak failed to adequately investigate the issues Plaintiff points to, which would support a finding of negligence. But the Ninth Circuit has made it clear that even gross negligence is not enough to prove a constitutional violation. *Martinez*, 943 F.3d at 1274 (explaining that the deliberate indifference standard "is higher than gross negligence, because it requires a culpable mental state") (internal quotations omitted).

Plaintiff analogizes to several cases, none of which are comparable to this case. *See* Pl. Resp. 10-12. First is *Wood*. In *Wood*, a police officer pulled a vehicle over at 2:30 am, determined the driver was intoxicated and arrested him, and had the vehicle impounded. 879 F.2d at 586. The plaintiff was a passenger in the vehicle, and according to her, the officer drove away and left her in the area with no open businesses in sight (in the era before cell phones). *Id.* The plaintiff was left alone in the middle of the night in a high-crime area in 50-degree weather with insufficient clothing, and she ultimately accepted a ride from a stranger, who drove her to a

secluded area and raped her. *Id.* The Ninth Circuit held that a reasonable jury could have concluded that the officer was deliberately indifferent to the plaintiff's safety as opposed to merely negligent. *Id.* at 588. As the Ninth Circuit stated, "the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense." *Id.* at 590.

The risk to Z.T. was not similarly obvious in this case. Defendant Slezak met with Gonzalez-Riddle and Z.T. and saw no sign that Gonzalez-Riddle was intoxicated. She detected only a brief whiff of marijuana in the car, and not from where Gonzalez-Riddle had been sitting. There is no evidence that she knew Gonzalez-Riddle would be driving; Ferreira was driving when the vehicle arrived at the meeting. Z.T.'s appearance was normal, other than a bruise on her face that was alleged to be caused by Townsend's girlfriend. Z.T. told Defendant Slezak that she felt safe with her mother but not her father. While further investigation might have led Defendant Slezak to conclude that it was not appropriate to leave Z.T. with Gonzalez-Riddle, the circumstances were not obvious enough to support a reasonable inference that Defendant Slezak was deliberately indifferent.

Plaintiff also analogizes to *Murguia*. Pl. Resp. 11. In *Murguia*, the complaint alleged that an officer arranged for a woman who was obviously having a mental health crisis to stay at a motel with her 10-month-old twins and no other supervision. 61 F.4th at 1115 n.14. The key difference between *Murguia* and this case is that the mother's mental health crisis in *Murguia* was obvious based on her erratic behavior that day. The danger in this case was not similarly obvious.

Plaintiff also cites *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001). Pl. Resp. 11. In *Currier*, one of the defendants perceived bruises on the children and did not investigate the cause of the bruises or one parent's allegations that the other parent had abused the children; his

conduct led to the abusive parent gaining custody. 242 F.3d at 919. Defendant Slezak did investigate the source of the injury to Z.T.'s face by speaking to Gonzalez-Riddle and Z.T. and reviewing evidence provided by Gonzalez-Riddle. Z.T. told Defendant Slezak she felt safe with her mother but not her father. Although a jury could find that the investigation was inadequate, it was not a complete failure to act on an obvious risk. The conduct in *Currier* is not comparable to Defendant Slezak's conduct.

Plaintiff also argues that Defendant Slezak's conduct could be found to "shock the conscience" if the Court determines that this was an emergency situation requiring a higher standard. Pl. Resp. 12-13. The Court need not reach that issue because it has already found that the regular deliberate indifference standard is not met. Plaintiff concludes his argument by questioning Defendant Slezak's judgment in not paying more heed to the immediate danger order and states that "a reasonable CPS worker would have been compelled" to infer that Gonzalez-Riddle posed a substantial risk of harm to Z.T. *Id.* at 13. That argument supports Plaintiff's negligence claim, but not the deliberate indifference claim. Deliberate indifference is a stringent standard, and it is not met here. Even viewed in the light most favorable to Plaintiff, the record does not support finding that Defendant Slezak subjectively perceived a risk to Z.T. and chose to expose her to it anyway. In sum, Defendants are entitled to summary judgment on Plaintiff's § 1983 claim.

//

//

//

//

//

**CONCLUSION**

Plaintiff's Motion for Partial Judgment on the Pleadings [29] is GRANTED IN PART

and DENIED IN PART. Defendants' Motion for Partial Summary Judgment [30] is GRANTED.

IT IS SO ORDERED.


DATED:   August 21, 2024         .



_____
MARCO A. HERNÁNDEZ
United States District Judge